# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| BARBARA NEFF, | : C.A. 10-685-RGA |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| MICHAEL J. ASTRUE, | : |
| Commissioner of Social Security, | : |
| | : |
| Defendant. | : |

## **MEMORANDUM OPINION**

Angela Pinto Ross, Esq., Wilmington, Delaware; Attorney for Plaintiff.

Charles M. Oberly, III, United States Attorney, Wilmington, Delaware; Heather Benderson, Special Assistant United States Attorney, Philadelphia, Pennsylvania; Attorneys for Defendant Michael J. Astrue, Commissioner of Social Security.

July 13, 2012
Wilmington, Delaware

ANDREWS, UNITED STATES DISTRICT JUDGE:

## I. INTRODUCTION

Plaintiff Barbara Neff appeals the denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act. Jurisdiction exists pursuant to 42 U.S.C. § 405(g).

Pending before the Court are cross-motions for summary judgment filed by Neff and the Commissioner. (D.I. 22, 25). Neff's motion for summary judgment asks the Court to remand to the Commissioner with instructions to award her DIB, or, in the alternative, reconsider the Commissioner's decision in light of this opinion. The Commissioner's cross-motion for summary judgment requests that the Court affirm the decision to deny benefits.

## II. BACKGROUND

### 1. Procedural History

Neff filed a request for disability in November 2007. The disability onset date was alleged to be May 31, 2007. Her claim was denied both initially and upon reconsideration. An oral hearing was held July 21, 2009 before an administrative law judge ("ALJ"). The ALJ denied Neff's application for benefits. The Appeals Council declined to overturn that decision, which thus became the final order of the agency. Neff filed a Complaint seeking judicial review of the ALJ's decision and a motion for summary judgment seeking benefits. (D.I. 2, 22). The Commissioner filed a cross-motion for summary judgment to confirm the denial of benefits. (D.I. 25).

## 2. Factual Background

Neff was 53 years old at the time she applied for disability benefits. Tr. at 145. Neff suffered a stroke in May 2007 and was hospitalized for over a week. Tr. at 282. Prior to her stroke, she worked as a project manager at a bank. Tr. at 42. In her application for benefits, Neff claimed disability due to the stroke, ensuing memory problems, depression, breast pain, restless and weak legs, rectal leakage, frequent gas, asthma, and diabetes. Tr. at 12-13. At her hearing, she also testified that she was treated for gastroparesis, numbness and tingling, urinary urgency, and osteoarthritis. Tr. at 13. Before the stroke, on April 11, 2007, she weighed 148 pounds. Tr. at 464. Neff testified that she was 5'2" and weighed 190 pounds at the time of the hearing. Tr. at 41-42. She worked as a bank clerk and project manager prior to the stroke. Tr. at 42-44. Her stroke caused her cognitive difficulties, including memory problems. Tr. at 55. After her stroke, she worked as a temporary receptionist for a few months. Tr. at 45. When that job ended, she discovered her typing skills were degraded and she completed a vocational program to gain skills. Tr. at 45. At the time of the hearing, she was employed as a mail clerk and worked five hours a day. Tr. at 46. Neff testified that she had a hard time working the part-time hours and became tired by 1:00 p.m. every day. Tr. at 46.

Neff testified about her gastroparesis, which made her unable to digest food and caused her to vomit once a week. Tr. at 47-48. Neff testified that she was depressed. Tr. at 62. She further testified to pains in her breast, neck and back spasms, and rated her pain as a seven out of ten when not medicated. Tr. at 49-50. Her doctors did not view her back spasms as serious enough to require treatment. Tr. at 49. Neff testified about her diabetes, which affected her gait and required that she use a cane. Tr. at 51. Her diabetes was not controlled. Tr. at 61. She took insulin four times a day and experienced numbness and tingling in her feet, but did not have open

3

sores. Tr. at 52. She also had three stiff toes, and pain in the bottom of her foot. Tr. at 51. Neff

testified that she was depressed. Tr. at 62. She did, however, take care of her personal hygiene,

visit relatives, dress herself, do bills, go shopping, and was able to drive. Tr. at 57-58.

A vocational expert testified. Tr. at 64. The ALJ presented hypothetical questions to the

expert consistent with her view of Neff's limitations:

> Q: Now, we're going to consider a hypothetical person who is about the
> claimant's stated age at onset, that would be 53 years. This individual has a high
> school education, is able to read, write and do at least simple math. There are
> certain underlying impairments that place limitations on the ability to do work-
> related activities. We'll start with a medium level of exertion, posturals are all
> occasional, but no climbing a ladder, rope [or] a scaffold. And environmentally
> this is a person who should avoid concentrated exposure to wetness, temperature
> extremes and humidity along with dust, odors, gases, fumes, poor ventilation and
> hazards. Within the parameters of the hypothetical, in your opinion, could such a
> person do any of the claimant's past relevant work?
>
> A: All of it.
>
> Q: All right. Now let's further change this hypothetical and indicate that there
> are additional impairments that would limit to simple, unskilled work. And let us
> also say that such a person would be ambulating with the aid of a cane. What
> impact, if any, would that have on the past relevant work?
>
> A: None, your honor.

Tr. at 65.

### c. The ALJ's Decision

The ALJ rejected Neff's claim for DIB in a twenty-three page opinion on August 19,

2009. Tr. at 12-34. In support thereof, the ALJ found that the claimant had four severe

impairments: "late effects of a cerebrovascular accident, diabetes mellitus, right leg hemiparesis,

and obesity." Tr. at 15. "The claimant [had] the residual functional capacity to perform medium

work . . . except that she could lift 50 pounds occasionally, 25 pounds frequently, stand or walk

for 6 hours in an 8 hour day, sit for 6 hours in an 8 hour day, occasionally climbing a ramp or

4

stairs, balancing, stooping, kneeling, crouching and crawling, but never climbing a ladder, rope or scaffold, avoiding concentrated exposure to wetness, temperature, and humidity extremes, gases, odors, fumes, poor ventilation and hazards." Tr. at 27. The claimant was capable of performing past relevant work as a project manager. Tr. at 33.

The ALJ therefore concluded that the claimant was not disabled.

## III. STANDARD OF REVIEW

### 1. Review of ALJ Findings

The Court must uphold the Commissioner's factual decisions if they are supported by "substantial evidence." *See* 42 U.S.C. §§ 405(g), 1383(c)(3); *Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986). "Substantial evidence" means less than a preponderance of the evidence but more than a mere scintilla of evidence. *See Rutherford v. Barnhart*, 399 F.3d 546, 552 (3d Cir. 2005). As the United States Supreme Court has noted, substantial evidence "does not mean a large or significant amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pierce v. Underwood*, 487 U.S. 552, 565 (1988).

In determining whether substantial evidence supports the Commissioner's findings, the Court may not undertake a de novo review of the Commissioner's decision and may not re-weigh the evidence of record. *See Monsour,* 806 F.2d at 1190. The Court's review is limited to the evidence that was actually presented to the ALJ. *See Matthews v. Apfel,* 239 F.3d 589, 593-95 (3d Cir. 2001). "Credibility determinations are the province of the ALJ and only should be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001).

5

The Third Circuit has explained that a "single piece of evidence will not satisfy the

substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by

countervailing evidence. Nor is evidence substantial if it is overwhelmed by other evidence-

particularly certain types of evidence (e.g., evidence offered by treating physicians)-or if it really

constitutes not evidence but mere conclusion." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.

1983).

Thus, the inquiry is not whether the Court would have made the same determination, but

rather, whether the Commissioner's conclusion was reasonable. *See Brown v. Bowen*, 845 F.2d

1211, 1213 (3d Cir. 1988). Even if the reviewing court would have decided the case differently,

it must defer to the ALJ and affirm the Commissioner's decision if it is supported by substantial

evidence. *See Monsour*, 806 F.2d at 1190-91.

## IV. DISCUSSION

### 1. Disability Determination Process

Title 11 of the Social Security Act, 42 U.S.C. § 423(a)(1)(D), "provides for the payment

of insurance benefits to persons who have contributed to the program and who suffer from a

physical or mental disability." *Bowen v. Yuckert,* 482 U.S. 137, 140 (1987). In order to qualify

for DIB, the claimant must establish that he or she was disabled prior to the date she was last

insured. *See* 20 C.F.R. § 404.131; *Matullo,* 926 F.2d at 244. A "disability" is defined as the

inability to do any substantial gainful activity by reason of any medically determinable physical

or mental impairment which can be expected to result in death or which has lasted or can be

expected to last for a continuous period of not less than 12 months. *See* 42 U.S.C. §§

423(d)(1)(A), 1382(c)(a)(3). A claimant is disabled "only if her physical or mental impairment or

impairments are of such severity that she is not only unable to do her previous work but cannot,

6

considering her age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A); *Barnhart v. Thomas,* 540 U.S. 20, 21-22 (2003).

In determining whether a person is disabled, the Commissioner is required to perform a five-step sequential analysis. *See* 20 C.F.R. § 404.1520; *Plummer v. Apfel,* 186 F.3d 422, 427-28 (3d Cir. 1999). If a finding of disability or non-disability can be made at any point in the sequential process, the Commissioner will not review the claim further. 20 C.F.R. § 404.1520(a)(4). At step one, the Commissioner must determine whether the claimant is engaged in any substantial gainful activity. If the claimant is engaged in substantial gainful activity, a finding of non-disabled is required. *See* 20 C.F.R. § 404.1520(a)(4)(i). If the claimant is not engaged in substantial gainful activity, step two requires the Commissioner to determine whether the claimant is suffering from a severe impairment or a combination of impairments that is severe. If the claimant is not suffering from a severe impairment or a combination of impairments that is severe, a finding of non-disabled is required. *See* 20 C.F.R. § 404.1520(a)(4)(ii).

If the claimant's impairments are severe, the Commissioner, at step three, compares the claimant's impairments to a list of impairments (the "listings") that are presumed severe enough to preclude any gainful work. *See* 20 C.F.R. § 404.1520(a)(4)(iii): *Plummer,* 186 F.3d at 428. When a claimant's impairment or its equivalent matches an impairment in the listing, the claimant is presumed disabled. *See* 20 C.F.R. § 404.1520(a)(4)(iii). If a claimant's impairment, either singly or in combination, fails to meet or medically equal any listing, the analysis continues to steps four and five. *See* 20 C.F.R. § 404.1520(e). At step four, the Commissioner determines whether the claimant retains the residual functional capacity ("RFC") to perform her

7

past relevant work. *See* 20 C.F.R. § 404.1520(a)(4)(iv); *Plummer,* 186 F.3d at 428. A claimant's RFC is "that which an individual is still able to do despite the limitations caused by [her] impairment(s)." *Fargnoli v. Massanari,* 247 F.3d 34, 40 (3d Cir. 2001). "The claimant bears the burden of demonstrating an inability to return to her past relevant work." *Plummer,* 186 F.3d at 428.

If the claimant is unable to return to her past relevant work, step five requires the Commissioner to determine whether the claimant's impairments preclude her from adjusting to any other available work. *See* 20 C.F.R. § 404.1520(g) (mandating finding of non-disability when claimant can adjust to other work); *Plummer,* 186 F.3d at 428. At this last step, the burden is on the Commissioner to show that the claimant is capable of performing other available work before denying disability benefits. *See Plummer,* 186 F.3d at 428. In other words, the Commissioner must prove that "there are other jobs existing in significant numbers in the national economy which the claimant can perform, consistent with her medical impairments, age, education, past work experience, and [RFC]." *Id.* In making this determination, the ALJ must analyze the cumulative effect of all of the claimant's impairments. *See id.* At this step, the ALJ often seeks the assistance of a vocational expert. *See id.*

## 2. The ALJ's Analysis and Neff's Appeal

Neff appeals the ALJ's conclusion that she is capable of returning to her previous job as a bank project manager. The ALJ applied the sequential analysis in rejecting Neff's claim. The ALJ found that Neff satisfied the first step as Neff was not engaged in a "substantial gainful activity," i.e., work activity involving significant physical or mental activities done for profit. Tr. at 15. For the relevant year of 2007, a person would be considered to be engaged in a "substantial gainful activity" if her monthly earnings exceeded $900 per month. Neff earned $4,145.00

8

during the 3rd and 4th quarters of 2007, which is over this threshold. Tr. at 14. The ALJ, however, concluded that this return to work was an "unsuccessful work attempt" because her work period only continued for a period of six months. Tr. at 15; 20 C.F.R. § 404.1574(c). Neff therefore had not engaged in substantial gainful activity since the alleged onset date of May 31, 2007. Tr. at 15.

The ALJ then considered whether Neff's alleged impairments were "severe" under the second step of the sequential analysis. Tr. at 15. The ALJ held that Neff's cerebrovascular accident (stroke), diabetes mellitus, right leg hemiparesis, and obesity were severe. Tr. at 15. The ALJ did not find, however, that Neff's depression, asthma, osteoarthritis of the spine and intercostal neuritis, rotator cuff tear, radiculopathy, hypertension, diabetic gastroparesis, diverticulitis, esophagitis, restless leg syndrome, urinary frequency and bowel incontinence, and cognitive impairments post CVA were severe impairments. Tr. at 18-26. The ALJ held that there was no evidence that these impairments had more than a minimal effect on her ability to perform basic work activities. Tr. at 26.

Because the ALJ did find some of Neff's alleged impairments to be severe, she continued to the third step of the sequential analysis to determine whether any impairment or combination of impairments medically equaled one of the listed impairments that presume disability. *See* Tr. at 26-27; 20 C.F.R. § 404.1520(a)(4)(iii). The ALJ found that this criterion was not satisfied. Tr. at 27.

The ALJ then continued to the fourth step and considered the entire record of Neff's medical history to determine Neff's residual functional capacity. Tr. 27. Taking into account the documentation provided by Neff's treating physicians, Neff's testimony of her subjective symptoms, the opinion of the non-treating physicians, and the supporting objective evidence, the

9

ALJ determined that Neff retained the residual functional capacity to perform her past relevant work as a project manager and that she was not disabled. Tr. at 27-34.

Thus, the ALJ did not need to reach the fifth step in the sequential analysis.

Neff challenges the ALJ's decision for four reasons: (1) The ALJ erred in failing to afford adequate weight to the opinion of Dr. Lasson, Neff's treating physician (D.I. 23, pp. 14-19); (2) The ALJ failed to consider the impact of Neff's obesity on her ability to work and therefore did not comply with SSR 02-01P (*Id.*, pp. 19-22); (3) The ALJ erred in not finding that memory impairments, osteoarthritis of the back, and gastroparesis were severe impairments (*Id.*, pp. 22-25); and (4) The ALJ's finding that Neff can perform her past relevant work was not based on substantial evidence. (*Id.*, pp. 25-28). These arguments are discussed in turn below.

### 1. The ALJ's Consideration of Dr. Lasson's Opinion

Neff argues that the ALJ erred in not crediting the conclusions of Dr. Lasson, Neff's treating physician. Neff points to Dr. Lasson's long history treating Neff, both before and after the stroke, in arguing that the ALJ erred in not granting the doctor's opinion controlling weight. Further, Neff argues that the ALJ's criticism of Dr. Lasson's opinion as being based on Neff's subjective complaints is not a valid reason to deny the opinion controlling weight.

Dr. Lasson filled out a "Physical Residual Functional Capacity Questionnaire" ("Questionnaire") summarizing her opinion of Neff's medical limitations. Tr. at 576-80. The doctor identified cerebrovascular accident (stroke), right hemiparesis, short term memory loss, chronic pain syndrome, diabetes, intercostal neuralgia, gastroesophageal reflux disease and high cholesterol as diagnosed illnesses. Tr. at 576. She further listed short term memory loss, numbness, chronic fatigue, diabetic gastroparesis, nausea, and various types of pain, including intercostal pain and pain under her breast as symptoms of these illnesses. Tr. at 576. When

10

prompted to indicate objective signs and clinical findings, Dr. Lasson listed high blood pressure and swollen feet. Tr. at 576. Dr. Lasson further stated that Neff suffers from depression, although she noted it was "actually better." Tr. at 577. Dr. Lasson further detailed extensive physical and mental limitations. Tr. at 577-79. For example, the doctor specifically noted that on a typical work day, Neff's pain and other symptoms would "constantly" interfere with her attention and concentration needed to perform even simple work tasks. Tr. at 577. Further, Neff's frequent memory impairment and chronic pain prevented Neff from working even low stress jobs. Tr. at 577. Dr. Lasson estimated that Neff would miss more than four days of work a month due to her symptoms. Tr. at 579. According to the vocational expert's testimony, such limitations would require a finding that Neff is disabled. Tr. at 67.

The ALJ gave little credit to Dr. Lasson's opinion. Tr. at 33. Neff argues in her brief that, according to Third Circuit law, "an ALJ must accord treating physicians' reports great weight, especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." (D.I. 23, p. 17). Neff's argument falls flat, as this is not an accurate statement of the law. The ALJ is only required to give a treating source opinion great weight when that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the claimant's case record." *Fargnoli*, 247 F.3d at 40.

Neff's own testimony provides evidence inconsistent with Dr. Lasson's opinion. Tr. at 46. Neff testified that she worked at least five hours a day as a mail clerk. Tr. at 46. Although she did say that she gets tired and does not believe she can work eight hours a day, she is apparently capable of carrying out the necessary tasks of employment for at least five hours a day. *See* Tr. at 46. This testimony cannot be squared with Dr. Lasson's opinion that Neff's pain and other

11

symptoms "constantly" interfered with her ability to perform even the simplest of tasks. Tr. at 577. It is also incongruous with Dr. Lasson's conclusion that Neff's pain and memory impairment prevent her from working even low stress jobs. Tr. at 577. The ALJ relied on these inconsistencies in declining to award Dr. Lasson's opinion great weight. Tr. at 33. These contradictions substantiate the ALJ's weighing of the evidence. Dr. Lasson's opinion was also inconsistent with the medical records of Neff's other treating physicians. For example, Dr. Lasson opined that "memory impairment" precluded Neff from working. Tr. at 577. Dr. Gersh, the neurologist who treated Neff after her stroke, stopped treating her when she had recovered in October 2007: "She has made an amazing recovery. There is no residual aphasia and no focal deficits at all at present." Tr . at 452.[1]

The ALJ did not ignore Dr. Lasson's extensive treatment history of Neff, despite Neff's insistence to the contrary. It is true that an ALJ must sufficiently explain how she is weighing a treating physician's opinion and take into account certain factors, including the length of the treatment relationship, the frequency of examination, the supportability of the opinion afforded by the medical evidence, the consistency of the opinion with the record as a whole, and the specialization of the treating physician. *See Gonzalez v. Astrue*, 537 F. Supp. 2d 644, 663 (D. Del. 2008). The ALJ's decision contains numerous details of Dr. Lasson's treatment of Neff's ailments, indicating that she understood the extent of the doctor-patient relationship. *See* Tr. at 15-21, 23, 24, 29, 31. The ALJ provided a reasonable explanation for her opinion and adequately accounted for the above factors.

Further, the ALJ's conclusion that Dr. Lasson's opinion was not formed on the basis of physical examinations, but stemmed from over-reliance on Neff's subjective complaints, is a

---

[1] Dr. Simon, a psychologist who examined Neff in February 2008, came to the same conclusion: "[Her] memory functioning is at a level equal to that of most people her age." Tr. at 542.

12

reasonable one. For allegations of pain and other subjective complaints to be credited, they must be consistent with objective medical evidence. *Burnett v. Comm'r of Soc. Sec. Admin.*, 220 F.3d 112, 122 (3d Cir. 2000). There is little objective evidence in the medical record of conditions that could consistently cause the pain as reported by Neff and as described in Dr. Lasson's opinion. Dr. Lasson's Questionnaire identified high blood pressure and swollen feet as the objective clinical signs, but these ailments cannot reasonably be thought to have produced the pain symptoms alleged by Neff. Tr. at 576. Neff testified to having serious back pain, but also testified that no doctor regarded her back pain as serious or in need of treatment. Tr. at 49. Neff further alleged severe intercostal pain, but the record shows her intercostal pain was shown to stem from dyspepsia, i.e., indigestion, and was cured with treatment. Tr. at 472. Neff complained of fatigue due to diabetes, but her endocrinologist stated that her diabetes was "very well controlled." Tr. at 611. Neff also testified that her gastroparesis was only an occasional problem. Tr. at 48. It was reasonable for the ALJ to conclude that Dr. Lasson's opinion regarding Neff's pain lacked objective justification and inappropriately relied on Neff's subjective complaints.

Rather than adopting the opinion of Dr. Lasson, the ALJ credited the opinions of non-treating physicians. When an ALJ relies on a non-treating physician's opinion over that of a treating physician, the non-treating physician's opinion must be examined for how well it takes into account and explains the pertinent evidence in the record. *Gonzalez*, 537 F. Supp. 2d at 661. Dr. Borek was hired by the Delaware Department of Disability Services to assess Neff's medical record and determine her residual functional capacity as expressed in his "Physical Residual Functional Capacity Assessment" dated December 28, 2007. Tr. at 521-28. In Dr. Borek's opinion, Neff retained the capacity to work. Tr. at 528. Dr. Borek's assessment shows he thoroughly evaluated Neff's medical record, including her history of depression, asthma,

13

diabetes, gastroparesis, radiculopathy, and stroke symptoms. Tr. at 527-28. Dr. Borek took into account Neff's neurologist's statements that Neff was "essentially normal" cognitively, had experienced an "amazing recovery" since her stroke, and did not suffer from residual aphasia. Tr. at 528. Dr. Borek further accounted for the facts that Neff was independent in her personal hygiene, took care of her mentally challenged boyfriend and cats, drove, shopped, used a computer, typed at 30 words per minute, and could express complex ideas. Tr. at 528. Dr. Borek judged Neff's credibility regarding her limitations as minimal based on Neff's return to part-time work. Tr. at 528. Dr. Borek provided a detailed and thorough evaluation of Neff's medical history and the ALJ acted properly in relying on it.

Neff further argues that the ALJ erred in crediting the opinion of a non-treating psychologist, Dr. Simon, over that of Dr. Lasson, in regard to Neff's cognitive abilities. In her Questionnaire, Dr. Lasson stated that Neff suffered from memory impairment, but there is no indication that Dr. Lasson conducted memory tests or any other psychological evaluation supporting her conclusion. A medical opinion not supported by medically objective evidence deserves no deference. *See Fargnoli*, 247 F.3d at 40. Dr. Simon, however, did conduct an in-person psychological evaluation of Neff, in February 2008. Tr. at 537-46. Dr. Simon specifically found that, "[Neff's] current testing results were unable to suggest that she is manifesting any significant cognitive or immediate and short-term memory problems at the present time." Tr. at 542. Dr. Simon came to this conclusion after conducting a battery of cognitive and memory exams. Tr. at 540-541. Neff also denied having any psychiatric problems or prior psychiatric treatment to Dr. Simon. Neff's first complaints to Dr. Lasson about her depression came just three days after denying experiencing psychiatric symptoms to Dr. Simon.[2] Neff's contradictory

---

[2] Dr. Lasson's notes state, "[Neff] has been very depressed and miserable for months." Tr. at 560.

14

statements, in combination with Dr. Simon's failure to detect mental impairment, provided the ALJ with substantial evidence to elect Dr. Simon's opinion over Dr. Lasson's.

## 2. Consideration of Obesity

Neff asserts that the ALJ failed to adequately discuss the extent her obesity would impact her workplace performance as required by Social Security Ruling 02-01p. SSR 02-01p states, "[a]n ALJ must meaningfully consider the effect of a claimant's obesity, individually and in combination with her impairments, on her workplace function at step three and at every subsequent step." Neff relies heavily on *Diaz v. Commissioner*, 577 F.3d 500, 504 (3d Cir. 2009). In *Diaz*, the Third Circuit remanded based on the ALJ's failure to analyze the cumulative effects of obesity on the claimant's symptoms. *Id*. The ALJ had made an obesity determination at step two of the analysis, but failed to adequately discuss the cumulative effects of the disease on other impairments at the subsequent steps. *Id.* Because the claimant specifically asserted obesity as an ailment, and common sense dictated that obesity would exacerbate the claimant's arthritic joint condition, the ALJ's failure to directly address obesity was reversible error. *See id.* Indirect discussion of medical reports that contained references to obesity was not enough. *Id.* The Third Circuit did indicate that it was not holding the ALJ to an unreasonable standard, noting that, "Were there *any* discussion of the combined effect of Diaz's impairments, we might agree with the District Court." *Id.* (italics in original).

The Commissioner argues that *Diaz* is not applicable, and instead relies on *Rutherford v. Barnhart*. 399 F.3d 546, 552 (3d Cir. 2005). In *Rutherford*, the Third Circuit affirmed an ALJ's decision despite the ALJ's failure to explicitly address the claimant's obesity. *Id.* Importantly, the claimant never asserted obesity as an impairment in the initial disability application. *Id.* The Third Circuit explained as follows:

15

An ALJ is required to consider impairments a claimant says he has, or about which the ALJ receives evidence. Although [the claimant] did not specifically claim obesity as an impairment (either in his disability application or at his hearing), the references to his weight in his medical records were likely sufficient to alert the ALJ to the impairment. Despite this, any remand for explicit consideration of [the claimant's] obesity would not affect the outcome of this case. Notably, [the claimant] does not specify how his obesity further impaired his ability to work, but speculates merely that his weight makes it more difficult to stand and walk. Additionally, the ALJ adopted the limitations suggested by the specialists and reviewing doctors, who were aware of [the claimant's] obesity. Thus, although the ALJ did not explicitly consider [the claimant's] obesity, it was factored indirectly into the ALJ's decision as part of the doctors' opinions.

*Id.* at 552-53. The Commissioner argues that *Rutherford* applies rather than *Diaz*, because Neff failed to allege obesity as an impairment on her disability application. Tr. at 150. In *Diaz* itself, however, the Third Circuit accounted for *Rutherford* and held that a claimant's failure to allege obesity initially does not absolve the ALJ from addressing it if the ALJ is on notice of the issue. *See Diaz*, 577 F.3d at 504. The Third Circuit limited *Rutherford* to situations where the claimant fails to argue that obesity actually impacted her job performance. *See Id.* Here, even though Neff failed to allege disability in her original disability report, the ALJ clearly factored obesity into the analysis, as obesity was found to be a "severe impairment" in step two of the sequential analysis. Tr. at 18. Neff's weight was at least a topic of discussion at the oral hearing, where Neff mentioned she gained fifty-five pounds in the previous year due to insulin and was attempting to lose the weight. Tr. at 42. Because the ALJ was on notice of Neff's obesity, the ALJ's treatment of obesity is subject to review.

The analysis does not end there, however. In *Diaz*, the case was remanded because the ALJ completely failed to analyze the cumulative impact of the claimant's obesity on her functional capacity when it was obvious that obesity would exacerbate her impairments. *Id.* at 504. Had the ALJ conducted even a minimal analysis of the issue, the Third Circuit would have upheld the decision. *See id.* In *Brown v. Astrue*, 789 F. Supp. 2d 470, 483-84 (D. Del. 2011), this

Court provided further clarification. The claimant did not specifically claim obesity as an impairment, but the ALJ determined that it was. *Id.* at 483. The ALJ stated that he considered the additional and cumulative effects of the claimant's obesity, but the ALJ did not provide an in-depth discussion of those effects. *See id.* at 483-84. The ALJ did describe the plaintiff's activities of daily living, social functioning, concentration, persistence and pace within step three of the analysis. *Id.* at 484. The ALJ further detailed the evidence of record concerning the plaintiff's residual functional capacity. *Id.* Significantly, the plaintiff did not specify any particular records or other evidence purportedly omitted by the ALJ related to her obesity. *Id.* at 483. The Court therefore stated, "Plaintiff's general assertion that her weight contributes to her loss of functioning is not enough to require remand 'particularly when the administrative record indicates clearly that the ALJ relied on the voluminous medical evidence as a basis for his findings regarding [plaintiff's] limitations and impairments.'" *Id.* For these reasons, the Court held that the ALJ satisfied the obesity analysis requirements as stated in *Diaz. Id.* at 484.

Like the ALJ in *Brown*, the ALJ here did not ignore Neff's obesity. She determined that Neff's obesity was a severe impairment, despite never being directly prompted to do so. Tr. at 18. The ALJ specifically mentioned that obesity in general has the capacity to adversely impact co-existing impairments.[3] The ALJ stated she fully considered obesity's effect in combination with Neff's other ailments and specifically rejected obesity as causing the physical limitations as Neff alleged. Tr. at 28. Unlike the claimant in *Diaz*, Neff does not provide objective evidence of

---

[3] "For example, obesity may affect the cardiovascular and respiratory systems, making it harder for the chest and lungs to expand and imposing a greater burden upon the heart. Someone with obesity and arthritis affecting a weight-bearing joint may have more pain and limitation than might be expected from arthritis alone. In addition, obesity may limit an individual's ability to sustain activity on a regular and continuing basis during an eight-hour day, five day week or equivalent schedule." Tr. at 30

17

joint ailments that would obviously be worsened by obesity.[4] Like the claimant in *Brown*, Neff
fails to point to any evidence in the record in support of the finding that obesity worsened her
symptoms. The Court cannot remand the ALJ's decision based on the failure to confront
evidence that does not exist. The simple fact that Neff became obese in 2008 does not
automatically justify the conclusion that it significantly worsened her symptoms. Were the ALJ
to independently assume that Neff's obesity had a significant detrimental effect on her
symptoms, the ALJ would be substituting her opinion for that of the medical experts, which she
cannot do. *See Morales*, 225 F.3d at 319. Finally, Neff's testimony that she worked five hours a
day undermined the argument that her obesity was seriously limiting. For all these reasons, the
Court finds that the ALJ adequately addressed Neff's obesity in the disability decision.

### 3. The Commissioner's Severity Findings

Neff argues that the ALJ erred at step two of the inquiry in determining that Neff's
memory impairment, osteoarthritis of the back, and gastroparesis were not severe impairments.
The Commissioner argues that it is irrelevant whether or not an individual impairment was
judged severe by the ALJ at step two, so long as at least one impairment was judged severe and
the ALJ continued to steps three and four of the sequential analysis. At that point, so long as the
ALJ fairly considered the effects of all of the alleged impairments, the ALJ would have
committed no cognizable error.

The ALJ must consider the aggregate effect of the entire constellation of ailments,
including those impairments that in isolation are not severe:

> When you have a severe impairment(s), but your symptoms, signs, and laboratory
> findings do not meet or equal those of a listed impairment in appendix 1 of this subpart,

---

[4] Neff did allege that she suffered from back pain, but admitted that it was not regarded as serious enough to require
treatment by her doctors. Tr. at 49. The ALJ was therefore not compelled to address the effects of obesity on her
back.

we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.

20 C.F.R. § 404.1545(e). The Commissioner is correct that it may be irrelevant whether the ALJ incorrectly adjudged an impairment as not severe, so long as the ALJ considered the effects of all impairments in conducting the sequential listing and residual functional capacity analysis. *See Salles v. Commissioner*, 229 Fed. App'x 140, 142 n. 2 (3d Cir. 2006). Of course, if the ALJ incorrectly categorizes an impairment at step two, there is a fair inference that the ALJ may mistreat the effects of that ailment down the line. The ALJ has a duty to fairly consider all of Neff's impairments proven by objective evidence. The Court will thus analyze the ALJ's treatment of the impairments in question: memory loss, osteoarthritis, and gastroparesis.

### a. Memory Loss

Subjective symptoms, such as memory loss, must be supported by objective medical evidence. *See Hartranft v. Apfel*, 181 F.3d 358, 362 (3d Cir. 1999). While it is true that Neff suffered a stroke in 2007 and suffered memory loss for a time thereafter, the psychological evaluation conducted by Dr. Simon in February 2008 showed Neff's memory to be very much within a normal range for a woman of her age.[5] His conclusions are consistent with those of Dr. Gersh, the neurologist who treated Neff after her stroke. For this reason, the ALJ's finding that memory loss played no more than a minimal role in reducing Neff's residual functional capacity was based on substantial evidence. Thus, the ALJ did not err in finding that memory loss was not a severe impairment.

---

[5] "Overall, results from the Wechsler Memory Scale indicate that [Neff's] immediate and short-term memory functioning is roughly equal to that of other individuals her age. In addition, when taking her intellectual testing scores into account, [Neff's] memory testing results were unable to suggest that she is showing signs of having any significant immediate or short term memory problems at this time." Tr. at 542

19

### b. Back pain

From October 2006 through November 2007, Neff was treated for back pain. Tr. at 650-58. Dr. Nancy Kim, M.D., a back specialist, began treating Neff's back pain, prescribing physical therapy and an injection in February 2007 after a referral from Dr. Lasson. Tr. at 660. Neff was unable to receive the injections due to potential complications from high blood pressure. Tr. at 657. An MRI of Neff's back revealed a hemangioma at the T3 vertebrae. Tr. at 650. Neff also saw Dr. Hollstein, a chiropractor, in May 2007. Tr. at 637-44. Dr. Hollstein appears to have treated Neff for a few weeks before referring her back to Dr. Kim. Tr. at 638. Dr. Kim concluded it was unlikely that Neff was suffering from the back disorders of thoracic discogenic pain or thoracic radiculopathy. Tr. at 650. Most likely, Dr. Kim concluded, the pain was due to intercostal neuralgia. Tr. at 650. Dr. Lasson later diagnosed Neff with dyspepsia, i.e. indigestion, discovering Dr. Kim's diagnosis of intercostal pain to be incorrect. Tr. at 472. The indigestion improved with treatment. Tr. at 472.

The ALJ correctly determined that Neff's back pain did not significantly limit Neff's residual functional capacity. Tr. at 21. Allegations of pain and other subjective symptoms must be consistent with objective medical evidence. *Burnett*, 220 F.3d at 122. Neff was required to prove an objectively determined medical condition that was of such severity that it could reasonably be expected to have given rise to the alleged pain. *See id.* Although Neff was treated for back pain in 2007, no objective evidence shows that those problems remained active subsequent to that year, as Neff sought no treatment and received no medication after November. Dr. Kim, a spinal specialist, determined that it was most likely that Neff's back pain was in fact due to intercostal neuralgia, and Dr. Lasson subsequently decided that the suspected intercostal neuralgia was actually a case of indigestion. Tr. at 650, 472. At Neff's oral hearing, when asked

whether she was currently receiving treatment for her back, she testified to the following: "We're not really doing anything for it right now. It's not, it's not severe enough that they're going to do anything right now. They do look at it about every six months." Tr. at 49. Here, Neff explicitly admits that her doctors regarded her back problems as not severe. This undercuts her characterization of her back pain as being at a level of seven out of ten and significantly limiting. Tr. at 49-50. The ALJ's decision shows a thorough review of Neff's history of back pain and noted the complete lack of back treatment in 2008-09. Tr. at 20-21. For these reasons, the ALJ acted with substantial evidence in not finding the back pain to be a severe impairment, and in declining to reduce Neff's residual functional capacity due to back pain.

### c. Gastroparesis

Neff was treated for gastroparesis by Dr. Hasan Ali, a gastroenterologist, in March 2007. Tr. at 440. Dr. Ali noted symptoms of vomiting and prescribed her Reglan and MiraLax. Tr. at 440. In August 2007, Neff was hospitalized for related vomiting. Tr. at 391. Dr. Pasad Kanchana, M.D., also treated Neff for gastroparesis, conducting an esophagoscopy, gastroscopy, and a duodenoscopy, and administered Botox injections as treatment. Tr. at 421-24. Dr. Kanchana noted tiny erosion in her esophagus and that the rest of her esophagus and bladder appeared normal. Tr. at 442. Following her August 2007 treatment, Neff reported to Dr. Ali that she felt much better and was able to eat without vomiting. Tr. at 581. In July 2008, Dr. Lasson noted that Neff's gastroparesis improved to the point where she only experienced morning nausea. Tr. at 622. In December 2008, Dr. Ali performed an esophagogastroduodenoscopy secondary to Neff's nausea and vomiting and administered more Botox injections into the pyloric sphincter. Tr. at 585. Neff testified that she continues to experience occasional episodes of weekly vomiting. Tr. at 48.

The ALJ held that Neff's gastroparesis was resolved after her treatment with the Botox injections and that the weekly vomiting did not appear to affect her ability to perform sustained work activities. Neff argues that the ALJ failed to take into account a March 2009 record from her endocrinologist indicating that she still suffered from gastroparesis. Tr. 588. It is true that the ALJ did not explicitly refer to that specific record, but being that the endocrinologist's notes indicate that Neff's symptoms were only "occasional," it is consistent with the ALJ's view of the evidence. This includes Neff's own testimony that she still suffers from occasional vomiting, which the ALJ accepted as true. Tr. at 23. The ALJ acted with substantial evidence in declining to substantially reduce Neff's residual functional capacity in connection with her gastroparesis.

### 4. The ALJ's Hypothetical Question to the Vocational Expert

Neff contends that the ALJ failed to properly form the hypothetical question to the vocational expert at the hearing. Specifically, she contends that the ALJ's question did not mention Neff's pain and fatigue, failed to incorporate Dr. Lasson's opinion, failed to account for the effects of obesity, and did not accurately convey the severity of several impairments.

Neff's argument is not persuasive. "[T]he ALJ must accurately convey to the vocational expert all of a claimant's credibly established limitations." *Rutherford*, 399 F.3d at 554. Consequently, an ALJ is not required to submit to the vocational expert every impairment alleged by a claimant. The hypothetical need only accurately portray the claimant's impairments supported by the record. Limitations that are not supported by objective evidence or limitations that are medically supported but contradicted by other evidence in the record need not be presented to the vocational expert. *Id.* Neff complains that the ALJ did not account for her subjective complaints in the hypothetical, but it is clear from the ALJ's decision that she did not credit those subjective complaints. Further, as previously discussed, the ALJ acted with

22

substantial evidence in making her determinations regarding Neff's treating physician's opinion, Neff's obesity, and the severity findings. The ALJ did not present the vocational expert with a hypothetical that reflects every argument of the claimant, but she did include the limitations supported by the record. Thus, the ALJ committed no error in relation to the hypothetical question.

## IV. CONCLUSION

For all these reasons, the Court finds that the ALJ acted with substantial evidence in her decision to deny Neff disability benefits. Thus, Neff's motion for summary judgment (D.I. 22) is DENIED and the Commissioner's cross-motion for summary judgment (D.I. 25) is GRANTED.